1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   ANGELIQUE NASH,                          Case No.  1:17-cv-00238-AWI-JLT (HC)

12              Petitioner,                    **FINDINGS AND RECOMMENDATION**
                                               **TO DENY PETITION FOR WRIT OF**
13        v.                                   **HABEAS CORPUS**

14   D. G. ADAMS,                              **[TWENTY-ONE DAY OBJECTION**
                                               **DEADLINE]**
15              Respondent.

16

17        Petitioner is currently serving a 25-years-to-life sentence in state prison for her conviction

18   of first degree murder.  She has filed the instant habeas action challenging the conviction.  As

19   discussed below, the Court finds the claims to be without merit and recommends the petition be

20   **DENIED.**

21   **I.    PROCEDURAL HISTORY**

22        On October 11, 2013, Petitioner was found guilty in the Kern County Superior Court of

23   first degree murder (Cal. Penal Code § 187).  (Doc. 1 at 1.)  The jury found true the special

24   circumstance that the murder was committed while she was engaged in the commission of

25   burglary (Cal. Penal Code § 190.2(a)(17)(G) & (d)).  (Doc. 1 at 1.)  She was sentenced to an

26   indeterminate term of 25-years-to-life.  (Doc. 1 at 1.)

27        Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

28   DCA").  On August 14, 2015, the Fifth DCA vacated the special circumstance finding but

affirmed the judgment in all other respects.  <u>People v. Nash</u>, 2015 WL 4880841, at *1 (Cal. Ct. App. 2015).  Petitioner filed a petition for review in the California Supreme Court, and the petition subsequently denied. (LD[1] 49, 50.)

On February 17, 2017, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.)  The Court dismissed the petition with leave to amend, and Petitioner filed a first amended petition on May 5, 2017.  (Doc. 10.)  Respondent filed an answer on January 11, 2018. (Doc. 22.)  Petitioner did not file a traverse.

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

Session lived with her adult son, John, in a house on Camino Sierra near Niles Street in Kern County. On the afternoon of April 14, 2010, her grandson, Andrew Masengale, visited Session at her home. [FN3] Session told Masengale she was not feeling well, and she went to lie down in her bedroom. She indicated that, after her nap, she was going to water the garden, start dinner, and pick up John from work. (Session usually took John to work in the morning and picked him up in the evening.) Masengale left his grandmother's house around 3:00 or 3:30 p.m. He exited through the back door, locking the door as he left. The front door of Session's house was always locked; friends and family used the back door.

[FN3] All further dates occurred in 2010 unless otherwise noted.

Neighbors of Session reported seeing a young man and two young women in the area that afternoon. Sometime between 2:00 and 4:00 p.m., nearby resident Patricia Sandoval noticed two young Black women standing together in her driveway looking toward her front door. Sandoval went to the front door and could see a young Black man standing outside and facing away from the door. The young man started to walk toward the two young women. Sandoval opened the front door and asked if she could help them. The shorter of the two young women asked for Matthew, and Sandoval told them no one by that name lived there. Later, when speaking with detectives, Sandoval picked a photograph of Katila from a six-pack photo line-up. Sandoval was also shown another six-pack photo line-up that contained a photograph of Nash, but she did not select any photograph from that six-pack.

Janet York lived two doors down from Session on Camino Sierra. Between 3:00 and 4:00 p.m., her doorbell rang, and a girl asked for Erika. York told her no one named Erika lived there. She thought the girl was Hispanic. After the girl started to walk away, York saw another young woman and a young man standing by the curb. York described the young man as Black and smoking a cigarette. The young woman appeared to be Hispanic.

[1] "LD" refers to the documents lodged by Respondent with the answer.
[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir. 2009).

2

Around 3:30 or 3:45 p.m., Kimbria Lopez was parking her car in front of her parents' house, which was next door to Session's house, when she saw Session on her front porch collecting her mail. Lopez's son, Jacob, was at his grandparents' house from about 1:00 to 7:00 p.m. that day. At some point, he went to the bathroom, which had a window facing Session's driveway. Jacob noticed a woman walking down Session's driveway. She wore an orange shirt and jeans. Jacob saw the woman walk toward the street and turn and glance over her shoulder. At trial, Jacob testified that Nash "[k]ind of" looked similar to the person he saw in Session's driveway.

Around 6:00 p.m., Masengale received a call from his mother, asking him to check on Session because she had not picked up John from work and she was not answering her phone. Masengale and his girlfriend at the time, Megan Winder, drove to Session's house. He opened the back door, which was unlocked, and noticed that the oven timer was buzzing. There were no signs of forced entry. As he moved to turn off the oven timer, Masengale stepped on Session's glasses, which were on the floor. He also noticed blood on a chair. He walked around a corner and found his grandmother lying on the floor. Her face "was just painted with blood," and she threw up blood.

Masengale asked Session if she had fallen, and she said no. He asked what happened, and she told him it was a Black man and Black woman. Session indicated they were looking for money, and she asked Masengale to get her purse, which she kept in a dresser drawer in her bedroom. He retrieved her purse and set it on the dining room table.

Winder called 911 at 6:31 p.m., and a recording of the call was played for the jury. She then went outside to look for the ambulance and flagged down California Highway Patrol Officer Richard Pierce. She told Pierce an elderly woman had been beaten and needed help.

Pierce grabbed his medical kit from his trunk and followed Winder into Session's house through the back door. Session was lying on the floor, and he administered first aid. Pierce asked Session "who had done this." Session said it was a young Black man and a young woman.

Kern County Sheriff's Deputy Ubaldo Weiss responded to Session's house after Pierce had arrived. He also asked Session "who had done this," and she responded a Black male and a Black female. Weiss tried to ask her if anything had been taken, but she was unable to respond.

Session was taken to the hospital by ambulance, and she died later that night. She was 81 years old.

Dr. Lesley Wallis conducted an autopsy of Session on April 15, and she located numerous injuries, including "[b]rain swelling, a broken nose, bruising and cuts around the face, a torn through and through top lip, bleeding in multiple locations and layers in Mrs. Session's brain." Blunt force trauma to the head was the cause of Session's death. A Wave cigarette butt was found in Session's house, and DNA was collected from the cigarette butt and compared to the known DNA of Moses, Nash, and Katila. "It was determined that David Moses was the major contributor. Katila Nash and Angelique Nash were both minor contributors." [FN4]

> [FN4] The facts described in this paragraph were stipulated to by the parties.

Jason Balasis, a detective in the robbery-homicide unit of the Kern County Sheriff's Office, was the lead investigator on the case.

On April 15, Balasis received information from a witness identified as Cecilia Martinez. She lived in a converted garage behind a main house on Center Street. Sonja Arnold, her niece Neferetiti Patterson, and her nephew Darontrell Gage lived in the main house. Martinez testified that Moses, Nash, and Katila also stayed at Arnold's house "off and on." On April 14 or 15, Martinez received information from persons who were living in Arnold's house, which prompted her to contact the Secret Witness Program. Martinez testified that she did not receive any compensation or reward for providing information to law enforcement, and she never stated that she was going to provide information in order to receive a reward.

As a result of Martinez's tip, Balasis spoke to Martinez and Arnold. Patterson and Gage are half-siblings, and Arnold served as Patterson's foster parent. Patterson and Moses are cousins. (Moses and Gage are not related.) Patterson was enrolled in high school. Patterson had a baby girl, and Arnold watched the baby during the day. Arnold had known Nash and her sister since they were young children. Nash was Patterson's best friend, and she would "pop in and out" of Arnold's house. Katila was Moses's girlfriend.

On April 14, Arnold observed Nash talking to Patterson in the afternoon. They were in the front yard, and Moses and Katila were with them. At trial, Arnold testified that Gage told her he knew something about Session's death. She denied that Patterson told her that she knew what happened to Session. [FN5] Arnold did not receive any money or benefit for testifying.

> [FN5] Balasis, however, testified that Arnold indicated to him that Patterson knew something about Session's death.

On April 16, Balasis and Detective Kavin Brewer interviewed Patterson at her high school. Balasis recorded the interview with a small digital recorder, and the audio recording was played for the jury. At the time of Patterson's interview, very limited information about the killing had been given to news media. No potential suspects had been identified, and no specific information about what happened to Session had been released.

In her interview with the detectives, Patterson described a conversation she had with Nash on April 14, during which Nash told her what happened to Session. Early in the interview, Patterson said:

> "She just told me what happened to the lady. She told me ... all she said was[, ']we broke into a house and your cousin knocked down a old lady.['] And I said[, ']why the hell [did y'all do that'] and they say[, ']well we were going to rob her['] and I said[,] 'well did y'all?['] [']No, she started screaming so we left.' Well she said, 'I ran. I don't know what they did.'" [FN6]

> [FN6] Balasis, however, testified that Arnold indicated to him that Patterson knew something about Session's death.

Patterson said Nash told her this. Moses and Katila were present during the conversation. Katila did not say anything; "[s]he was just crying." Moses "kept shaking his head," and saying "'I'm sorry cuz. I'm sorry.'" [FN7]

4

[FN7] Patterson referred to her "cousin" standing there during the conversation, but also confirmed his name was David and identified his photograph.

Later in the interview, Patterson stated that Moses said he thought the victim was "still alive," but he did not know. He indicated that the victim was making noises, which Patterson described as screaming or "old people noises like how when they hurt."

Balasis asked whether Nash said Moses did anything to make the victim stop moaning. Patterson replied: "No, she said ... I ... she said she don't ... 'I didn't know what happened [after] that but I tried to leave.' Angie said she left them, but she went back for them." [FN8] Patterson said all three went in the victim's house, "but [Nash] left them so, whatever, cause she said she couldn't do it. She said, 'I had a guilty [conscience]. I left.'" [FN9] According to Patterson, Nash said, "'but I was thinking I can't do this, that's why I didn't do nothing.'" Patterson continued, "She said, 'But when I came back, that bitch was already dead so I took off.'"

[FN8] We hear, "'I didn't know what happened after that....'" The transcript, however, does not include the word "after."

[FN9] The transcript uses the word "conscious" rather than "conscience." Later in the interview, Patterson stated that Nash said she was thinking about how it was "an old lady" and they were "gonna go to hell." Patterson continued: "[Nash] said then[, ']I'm thinking we gonna go to jail.['] She said[, ']so I left.['] She said[, ']but then I thought about it, that's my sister and that's David. I got to go get them.[']"

Patterson told the detectives that Nash said she "was going to take something" from Session's house but she did not take anything "because that lady was scaring [her]." The victim scared Nash because she was screaming. Nash told Patterson none of them took anything. Katila said, "'I didn't take nothing. I would have took something but he didn't put her in the closet.'" Patterson said that Moses did not say anything to her, but Moses told Gage what happened.

Patterson also reported that Nash had called her the previous night (April 15). Nash talked about how Session's death was on the news. She was crying and asked how everyone knew. Nash said, "'we going to jail,'" and asked Patterson what she should do. Patterson told her she did not know.

On April 17, Nash and Katila were arrested together at a motel. Moses turned himself in later that day or in the early morning hours of April 18. After Balasis advised Nash of her *Miranda* [FN10] rights, he and Brewer questioned her. The interview was videotaped, and a DVD of the interview was played for the jury.

[FN10] *Miranda v. Arizona (1966) 384 U.S. 436.*

Nash told the detectives she and Katila were at their mother's house on Niles Street and Moses came over. Moses said his friend, Matthew, had some weed. Nash had never met Matthew. Nash, Katila, and Moses left her mother's house around 3:00 p.m. They started walking down the street. Nash said they went to three houses before they went to the victim's house.

At Session's house, Moses said it was Matthew's house and Matthew's "grandma

5

said come on." He had knocked on the front door and no one answered. Then he went to the back of the house. Nash and Katila were standing near a truck parked on the street. Moses came back out and got Katila, and the two of them went to the back of the house.

Nash said that she stayed by the street "['c]ause he kept lying to us talking about Matthew house. First he talking about this was Matthew house and that." She told the detectives Moses was "acting weird." [FN11] Balasis asked why she stayed outside, and Nash responded, "Because I didn't believe him." Brewer asked if Nash thought Moses and Katila were going to break in the house to steal stuff, and she shook her head no.

> [FN11] Balasis asked how Moses was acting weird, and Nash responded that he was "just talking like, playing too much." Balasis asked what Moses said, and Nash stated that she did not remember.

Nash said she heard a boom and a scream and she went to get Katila and Moses. Katila opened the front door of Session's house and called to Nash. Nash ran in the house. She denied ever seeing the victim, but she heard her screaming. Nash yelled at Katila and Moses to come on, and then she ran out of the house. Katila and Moses did not leave the house, and Nash ran back in. She said the second time she ran out of the house, Katila and Moses followed her.

When she entered the victim's house the first time, Nash saw Katila crying but did not see Moses. She heard the victim say, "oh lord help me." Throughout the interview, Nash maintained that she never saw the victim. Balasis asked whether she walked down the driveway to the back part of the house. Nash responded that she did, but she denied that she ever went through the back door of Session's house. Nash stated that she heard a "boom" and she was "about to walk away," but instead she went in the house through the front door. Nash said she did not know how Moses and Katila got in Session's house. She repeated that she thought Moses was lying "cause he was laughing." Nash said she "barely went in" Session's house and she was only in the living room.

Balasis had an aerial photograph of the area, and Nash pointed out where her mother's apartment was on the photographic map. She said that Moses told Katila to knock on the door of a house. She described a Mexican woman with long brown hair who answered the door. She did not remember going to a house two doors down from the victim's house. Balasis told Nash a woman reported that a girl knocked on the door and asked for Erica. Nash said she did not go to anybody's door. Moses and Katila had knocked on doors.

After they left Session's house, Nash, Katila, and Moses went to Nash's mother's house. Moses said he was going to Arnold's house, and they all walked there. Nash said that Katila and Moses told her the victim was an old lady. Katila told Nash that Moses knocked down an old lady, and Moses said he hit her twice. Moses said he did not know why he hit her. Nash thought she was wearing an orange shirt and had braids in her hair that day.

At Arnold's house, Moses went in the house and talked to Gage. Nash told Patterson what happened. Katila was crying. They waited outside for Nash's sister Sherina, and Sherina's "baby daddy" picked them up. They dropped Moses off on Union Street and then went to Sherina's house.

Nash told her father and Sherina what happened. Balasis asked Nash why she told

Patterson that they were looking for houses to steal from. Nash responded that she did not tell Patterson that. Nash said, "She told me she didn't tell y'all nothing."

The detectives told Nash that Session was lying on the floor in the living room and suggested she must have seen her, but Nash repeated that she never saw the victim. Nash also maintained that she did not tell Patterson they were looking for a house to steal from.

At trial, Patterson testified that she recognized Balasis and remembered talking to him in April 2010 at her high school. Patterson agreed that she talked to Balasis about what Nash had told her, but she claimed that she had lied to Balasis. She admitted that she told the police that Nash told her the old lady started screaming so she left, but she denied that Nash actually said that. Patterson remembered telling people she saw Katila crying, but she testified she had been lying. Patterson agreed that she told Balasis that Nash said she was going to take something from the old lady's house, but she testified that Nash did not say that.

Patterson claimed she lied to Balasis because she was being blackmailed. She testified: "I lied to him, and it was a money situation with my Aunt Sonja Arnold, Cecilia Martinez, and other people who were around the area staying in our house, all kind of things like that so I lied to the police. And I was going to court for my daughter, and I figured that if [Arnold] got what she wanted I could have my baby plus she had the care." Patterson testified the money was supposed to come from the police. Patterson never told anyone she had lied to the police about the case until September 2012, when Nash first went to trial.

On January 10, 2013, Nash had a telephone conversation with her father about her second trial, for which jury selection had just begun. Specifically, they discussed Patterson's potential testimony and the admissibility of Patterson's interview with law enforcement. Nash told her father that Patterson needed to "plead the ... 5th" because, Nash believed, this would mean Patterson's previous statements could not be admitted as evidence. The telephone call (which occurred while Nash was in custody) was recorded, and the recording was played for the jury at Nash's third trial.

The parties also stipulated to the following facts: Moses and Katila personally committed or attempted to commit a first degree residential burglary on April 14 at Session's house and the victim was Session. "Moses as a perpetrator punched and assaulted Dorothy Session causing the injuries stipulated to," and "Moses caused the death of Dorothy Session during the commission or attempted commission of [the] burglary."

Nash, 2015 WL 4880841, at *1–6.

## III.     DISCUSSION

### A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as

7

guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.  Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal

8

court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Claims

Petitioner presents two grounds for relief. She alleges she received ineffective assistance of counsel when the trial court committed constitutional error by denying counsel's motion to withdraw for the purpose of testifying. She also claims the special circumstance is unsupported by evidence.

///

///

9

1. **Ineffective Assistance of Counsel**

a. State Court Background

This claim was presented on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> After the prosecution had begun presenting witnesses at trial, Nash's attorney, Fred Gagliardini, moved to withdraw as defense counsel so that he could add his name to the witness list. He indicated that he intended to testify about a discussion he had with Nash relating to the Fifth Amendment. This attorney-client discussion occurred prior to Nash's telephone conversation with her father, and the apparent purpose of Gagliardini's proposed testimony was to explain or provide context for Nash's statements to her father regarding evidence of Patterson's prior statements.
>
> The trial court appointed independent counsel to advise Nash on the matter. Nash agreed to a stipulation instead of having her attorney testify. Thus, the matter was resolved without Gagliardini testifying or withdrawing.
>
> Now Nash contends the trial court erred by denying her attorney's motion to withdraw. She further argues that the manner in which the matter was resolved was coercive and resulted in denial of her right to counsel and her right to due process.
>
> **A. Background**
>
> **1. Recorded telephone call from jail between Nash and her father**
>
> As we have mentioned, the prosecution presented evidence of a recorded telephone conversation Nash had with her father on January 10, 2013. During the conversation, Nash stated that if Patterson testified, the jurors would think she was lying at trial to help Nash, not that she had lied earlier to law enforcement. Nash told her father, "They don't think she's lying *against* me they think she lying for *me*." (Italics added.)
>
> Later in the conversation, Nash opined that Patterson should invoke her right to remain silent rather than testify:
>
> > "[Nash]: [She] need to plead the fucking 5th. That's the whole fucking point [Patterson's] fat ass need to plead the fucking 5th.
> >
> > "[Father]: If she go up there and plead the 5th then what you think the D.A. going to do?
> >
> > "[Nash]: They can['t ... use her statement.
> >
> > "[Father]: How come they can't?
> >
> > "[Nash]: Because she pleads the 5th everything she say get wiped out. That's pleading the 5th.
> >
> > "[Father]: Um they going to go back and play that tape or they going to ask her ...

10

"[Nash]: No they cannot because they cannot cross examine her that's the whole point. That's why they can't use Katila that's why they can't use [Moses ']cause they cannot cross examine them." [FN12]

[FN12] Balasis questioned Katila and Moses after they were arrested. Here, Nash suggests their statements to Balasis would not be admitted as evidence because they would not testify at her trial. We note that, in the third trial, Nash filed a motion in limine seeking to exclude all extrajudicial statements by Moses and Katila, and the prosecutor responded that he did not intend to offer their interviews into evidence.

Nash's father stated his understanding that a person cannot "plead the fifth" if there are no charges pending, and Nash responded, "You can plead the 5th if you lied up on the stand they can go to jail for perjury." Without evidence of Patterson's statements from April 16, 2010, Nash said, the prosecution had nothing.

Her father asked, if Nash was correct, why was she not going home? Nash replied: "Because [Patterson] is about to get up there and talk. [¶] ... [¶] And they going to believe that she lying for me." Nash's father said he thought Patterson "made most of [that shit] up to make it sound good for the police." Nash interrupted, "Well I don't care what they want to make up sound good for the police. I wish they plead the fucking 5th. I don't give a fuck what they lied about plead the fucking 5th."

## 2. Proceedings at third trial

### a. Court rules excerpts of telephone call are admissible with no objection from Nash

On July 12, 2013, the court heard motions in limine for Nash's third trial. Nash requested and was granted a hearing under Evidence Code section 402 regarding evidence of any "jail calls." The recording of the telephone conversation between Nash and her father was played for the court.

The prosecutor indicated that he intended to present the portion of the recorded telephone conversation during which Nash stated that she wanted Patterson to "plead the 5th." He told the court, "I'm interested in [this part of the conversation] for demonstrating [Nash] is well aware of the importance of this recorded interview that took place two days after the crime and she wants [Patterson] not to testify." He claimed the evidence "goes to show a consciousness of guilt in that she doesn't want the jury to hear a ... piece of evidence that is particularly damaging."

Gagliardini stated that the portion of the conversation the prosecution wanted to introduce was complemented by Nash's earlier statement to her father to the effect that the jury would believe Patterson was lying to try to help Nash. He asserted:

"[Nash] is concerned that the jury is perceiving that her best friend is lying from the stand, ... to benefit [Nash]. For that reason [Patterson] needs to plead the 5th. She's come in. She's perjured herself [in the previous trials]. She needs to quit coming in and lying. A common-person view of how do you stop that from happening is you come in next time and you say I can't talk about this situation anymore because I lied last time."

Gagliardini stated that he did not have any objection to admitting the part of the conversation the prosecutor requested. He only wanted the jury to hear the

additional earlier part of the conversation to give the jury a more complete understanding and context for the conversation. The trial court ruled that both excerpts of the recorded telephone call were admissible.

### b. Nash's attorney moves to withdraw

On July 18, 2013, after trial had begun and outside the presence of the jury, the trial court stated on the record that there was a "potential need for independent counsel to advise Ms. Nash with respect to an issue as to whether or not Mr. Gagliardini either should or may provide testimony on a certain subject." The trial court noted that the parties had discussed the matter off the record in chambers and, further, the court had requested an attorney from the Indigent Defense Program (IDP) to appear the following day to advise Nash.

On July 19, 2013, IDP attorney Anthony Bryan was present in court to meet with Nash. Gagliardini was given an opportunity to state the matter on the record. Gagliardini explained that he believed he should be a defense witness so that he could testify about his conversations with Nash regarding the Fifth Amendment, which would give context and explain her subsequent recorded telephone conversation with her father:

> "During the last trial my client[, holder of the attorney-]client privilege, made a phone call to her father and discussed, albeit ... inaccurately, a conversation that she and I had as relates to the Fifth Amendment, [the] suppression of statements of witnesses, playing of unavailable witness[es]' prior testimony.

> "Now, it's true that she doesn't mention me in that phone call directly, but in the third trial now the People are seeking to admit a portion of that telephone call for two purposes. It is my understanding that at least one of those purposes is as circumstantial evidence to demonstrate Ms. Nash's consciousness of guilt, and I believe secondarily that Ms. Nash either attempted or inferentially attempted to have her father talk to Nefertiti [sic ] Patterson, the witness, ... that I'm discussing and try and get her to exercise the Fifth Amendment privilege.

> "Having reviewed my notes it's become apparent that phone call was made within a few days during the last trial of a conversation I had with my client. It would be necessary for me to provide effective assistance of counsel to call as a witness anyone who could help explain that conversation with her father. That testimony would be necessary, available to prevent ... Ms. Nash ... from being forced to waive her Fifth Amendment right to take the stand and, in essence, further explain the content of that call.

> "Moreover, whatever witness would be available would be tactically and strategically required to provide effective assistance of trial. As a criminal specialist over 200 trials and over a quarter being homicide and/or violent felonies, I can't sit before this Court and think of a reason in which to ignore such a witness'[s] testimony if it were available.

> "There is a witness available. Unfortunately, as the Court's aware and the People are aware, that witness would be me. Therefore, I'm seeking to add my name to the witness list at this point and indicate to the Court that at this point I would ask the Court to be permitted to withdraw from the case

based on the current bar rules and the cases that we have discussed at ... length both back and forth via email and in chambers. [¶] ... [¶]

"I don't have any other option than to say I would be needed as a witness to help further explain the conversation.... I would ask this Court do—if it denies my request to withdraw from the case that independent counsel be appointed to advise Ms. Nash on the issues related to my continued representation of her in this trial and her ability to waive me being conflict free in my mind, and I believe we have an attorney present already prepared, ready to do that should the Court deny my motion to withdraw as counsel."

The prosecutor stated that he did not believe withdrawal was appropriate. As a preliminary matter, he argued that Gagliardini's testimony was not relevant to the issue of Nash's consciousness of guilt. He also suggested that if the attorney's testimony were relevant, Gagliardini could testify without withdrawing as Nash's attorney.

Although Gagliardini had not proffered his proposed testimony (as he had not revealed any attorney-client privileged information), the trial court rejected the prosecutor's preliminary argument and determined that Gagliardini's testimony was potentially relevant. [FN13]

> [FN13] The court explained, "I do think the testimony has at least some relevance ... to potentially explain why it is that Ms. Nash is knowledgeable about that information[, i.e., the law] and, therefore, at least arguably might tend to lessen the, I guess, if you will, argued nefarious character of the comments made and lessen the inference that there is a consciousness of guilt."

### c. Court appoints independent counsel to advise Nash and Nash agrees to stipulation in lieu of her attorney's testimony

The court then observed, under rule 5–210(C) of the Rules of Professional Conduct, an attorney acting as an advocate before a jury may also testify so long as there is informed, written consent from the client. [FN14] The court cited *People v. Marquez* (1992) 1 Cal.4th 553, in which one of two defense counsel in a capital case was permitted to testify.

> [FN14] Rule 5–210 of the Rules of Professional Conduct (hereafter Rule 5–210) provides: "A member shall not act as an advocate before a jury which will hear testimony from the member unless: [¶] (A) The testimony relates to an uncontested matter; or [¶] (B) The testimony relates to the nature and value of legal services rendered in the case; or [¶] (C) The member has the informed, written consent of the client. If the member represents the People or a governmental entity, the consent shall be obtained from the head of the office or a designee of the head of the office by which the member is employed and shall be consistent with principles of recusal."

Therefore, the court reasoned, Gagliardini could testify on behalf of Nash without withdrawing as defense counsel if Nash were to give informed, written consent. The court stated: "I agree with [the prosecutor's] interpretation ... of the law and of the state bar rule that under the proper circumstances[—]that is with the informed

13

written consent[—]Mr. Gagliardini may testify, and so for that reason I am denying the motion for him to withdraw at this point in time, though I think it proper and appropriate for him to make it pursuant to his ethical responsibilities...."

The court appointed Bryan to advise Nash on the matter. [FN15] The court took a recess to give Bryan and Nash time to discuss the issue.

> [FN15] The court stated, "I think the safest course and the one I will follow is to appoint independent counsel to advise Ms. Nash with respect to that issue and make sure her rights are protected in that regard.... Mr. Bryan, who is ... qualified to handle not only homicide but capital cases ... is qualified to advise Ms. Nash with regards to that issue."

The proceedings resumed after Nash had an opportunity to speak with both Bryan and Gagliardini. Bryan informed the court that Nash would be willing to allow Gagliardini to negotiate a stipulation, which "would be in place of live testimony by Mr. Gagliardini from the witness stand." Further, Nash was "prepared to authorize Mr. Gagliardini to do so presently and to waive her right to have her lawyer not have to do something like that and also waive confidentiality [i.e., the attorney-client privilege] to the point of allowing Mr. Gagliardini to negotiate such an agreement." The court went off the record to allow the attorneys time to negotiate a stipulation if possible. Back on the record, the court stated that the attorneys had agreed to a stipulation, which referred to Nash's "attorney at that time," but did not name Gagliardini. [FN16] The prosecutor, Gagliardini, and Bryan all agreed to the language of the stipulation.

> [FN16] The court opined that it was "wise" not to mention Gagliardini by name as this "alleviates at least one issue in terms of the jury considering the attorney dual role."

Given that the parties agreed to a stipulation in lieu of testimony from Gagliardini, the court concluded that written consent from Nash was not required. [FN17] The court stated, however, that if either Gagliardini or Bryan wished to obtain a written consent from Nash, it could be done. The court then allowed Bryan to question Nash for the record:

> "Mr. Bryan: You know that the Judge has appointed me to address the issue regarding ... whether or not Mr. Gagliardini will testify or execute a stipulation regarding the case that you're in trial for right now. Do you understand that?

> "[Nash]: Yeah.

> "Mr. Bryan: Okay. And did you meet with me this morning?

> "[Nash]: Yeah.

> "Mr. Bryan: And have you had an opportunity to speak with me again this afternoon?

> "[Nash]: Yeah.

> "Mr. Bryan: Pursuant to those discussions have you been aware that you have a right that Mr. Gagliardini not testify?

14

"[Nash]: Yeah.

"Mr. Bryan: Are you ... aware of the fact that you also have a right that Mr. Gagliardini not make representations regarding a stipulation regarding what he would testify to?

"[Nash]: Yeah.

"Mr. Bryan: And ... after knowing those things and after discussing it with me and hearing what the Court has had to say, that is to say Judge Somers, are you willing to waive one of your right[s] and authorize Mr. Gagliardini to ... negotiate and ... sign ... the stipulation that you have now had a chance to read?

"[Nash]: Yeah.

"Mr. Bryan: And is that agreeable to you?

"[Nash]: Yeah.

"Mr. Bryan: Okay. You understand that that stipulation ... will be able to be read by someone to the jury that is sitting in this case?

"[Nash]: Yeah.

"Mr. Bryan: Okay. That's the purpose of the stipulation. Do you understand that?

"[Nash]: Yeah.

"Mr. Bryan: Okay. Fine. [¶] Nothing further, your Honor."

[FN17] The court explained: "Rule 5–210 does require that if an attorney is to testify there be [informed] written consent from the client. In this case, of course, Mr. Gagliardini will not be testifying, and his name is not included in the stipulation so the jury will not know ... whether he was the source of the information, which is the basis of the stipulation. [¶] My view under the rule is that under those circumstances a written consent is probably not required, because he is not actually testifying."

The court stated that the issue was resolved from its perspective and asked the prosecutor and Gagliardini whether they had anything to add. They did not. The court thanked everyone and expressed appreciation for their "help in resolving the matter."

### d. The stipulation the parties agreed to in lieu of testimony

Later in trial, the jury heard portions of Nash's recorded telephone call with her father made on January 10, 2013. Immediately after the recording was played, the jury heard the following stipulation:

"Prior to January the 10th, 2013, Angelique Nash's attorney at that time had discussed with Ms. Nash certain issues related to Fifth Amendment rights and due process. The attorney also discussed how those topics

related to Ms. Nefertiti [sic] Patterson's upcoming testimony during a jury trial held in January 2013.

"Her attorney at that time discussed under what circumstance Ms. Nefertiti [sic] Patterson's prior testimony and tape recorded interview with Detectives Balasis and Brewer could be played to the jury."

**B. Relevant law**

"The determination whether to grant or deny a motion by an attorney to withdraw is within the sound discretion of the trial court and will be reversed on appeal only on a clear showing of abuse of discretion." (*People v. Sanchez* (1995) 12 Cal.4th 1, 37, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *People v. Horton* (1995) 11 Cal.4th 1068, 1107.)

As the trial court correctly stated, Rule 5–210 provides, "A member [of the California state bar] shall not act as an advocate before a jury which will hear testimony from the member unless" one of three specified circumstances is present, including the circumstance that "[t]he member has the informed, written consent of the client."

The general rule and exception reflect competing concerns regarding an attorney acting as both an advocate and a witness. On the one hand, "[w]here a lawyer representing a party in trial is also a witness during the trial, his or her effectiveness, both as a lawyer and as a witness, may be impaired in the eyes of the fact finder. Such disadvantage enures to the detriment of the party being represented by the lawyer serving such a dual function." (*Smith, Smith & Kring v. Superior Court* (1997) 60 Cal.App.4th 573, 578.) [FN18]

> [FN18] We note there is an additional concern in cases where an attorney acts as a prosecutor and a witness. "Within the criminal justice system, the prohibition against a prosecutor's acting as both advocate and witness addresses 'the concern that jurors will be unduly influenced by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors.' [Citation.] ... The maxim ' "justice must satisfy the appearance of justice" ' reflects the 'especially acute' need for public confidence in the administration of justice where the testifying attorney represents the 'prosecuting arm' of government. [Citation.] Judicial condemnation of the 'practice of serving as both prosecutor and witness' has deep roots not only in English and American law but also in Roman law. [Citation.]" (*People v. Donaldson* (2001) 93 Cal.App.4th 916, 928–929.)

"On the other hand, the client has an interest in competent representation by an attorney of his or her choice [citations], and perhaps, the interest in avoiding inconvenience and duplicative expense in replacing counsel already thoroughly familiar with the case." (*Lyle v. Superior Court* (1981) 122 Cal.App.3d 470, 481.) "[I]f a party is willing to accept less effective counsel because of the attorney's testifying, neither his opponent nor the trial court should be able to deny this choice to the party without a convincing demonstration of detriment to the opponent or injury to the integrity of the judicial process." (*Id.* at p. 482.)

Our Supreme Court has recognized that "[a]n attorney must withdraw from representation, *absent the client's informed written consent*, whenever he or she knows or should know he or she ought to be a material witness in the client's

cause. [Citations.]" *People v. Dunkle* (2005) 36 Cal.4th 861, 915, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22, italics added.) "The determination whether an attorney ought to testify ordinarily is based on an evaluation of all pertinent factors, including the significance of the matters to which the attorney might testify, the weight the testimony might have in resolving such matters, and the availability of other witnesses or documentary evidence by which these matters may be independently established. [Citation.] An attorney should 'resolve any doubt in favor of preserving the integrity of his testimony and against his continued participation as trial counsel.' [Citation.]" (*People v. Dunkle, supra*, at p. 915.)

"The attorney-client privilege ... authorizes a client to refuse to disclose, and prevent others from disclosing, confidential communications between lawyer and client, [and] is considered a hallmark of our jurisprudence." (*People v. Navarro* (2006) 138 Cal.App.4th 146, 156; see Evid. Code, § 954.) "The privilege is fundamental to our legal system and furthers the public policy of ensuring every person's right to freely and fully confer with and confide in his or her lawyer in order to receive adequate advice and a proper defense." (*People v. Navarro, supra*, at p. 156.) An attorney is obligated to claim the attorney-client privilege whenever privileged communication is sought to be disclosed. (Evid. Code, § 955.)

### C. Analysis

Nash contends the trial court committed constitutional error by denying Gagliardini's motion to withdraw for the purpose of testifying. She further argues the trial court deprived her of the right to counsel at a critical stage "by forcing her to be the one who decided whether trial counsel should violate the advocate-witness prohibition." (Boldface and capitalization omitted.) Finally, she argues the waiver of her attorney's testimony was involuntary because she was coerced into choosing between losing Gagliardini's testimony or being represented by an attorney who was forced into an "advocate-witness conflict." [FN19]

> [FN19] Nash used the term "conflict" throughout her arguments, but we note the circumstance of an attorney acting as an advocate and a witness is not, by itself, a conflict of interest, i.e., a situation "in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests." (*People v. Bonin* (1989) 47 Cal.3d 808, 835.) The conflict to which *Nash* refers is simply that an attorney is taking on dual roles as advocate and witness.

We disagree with Nash's characterization of the trial court's disposition of the issue. As the Attorney General asserts, the trial court's initial denial of Gagliardini's motion to withdraw was *provisional* only. The trial court explained that, because under certain circumstances Gagliardini could testify without withdrawing—that is, if Nash were to give informed, written consent under Rule 5–210(C)—it was "denying the motion for him to withdraw *at this point in time*...." [FN20] (Italics added.) The trial court then appointed independent counsel to advise Nash on how she may want to proceed. The court stated:

> "What we'll do at this point in time is we will informally appoint [Bryan] to represent Ms. Nash [to advise her on the issue], and we will go ahead and go off the record at this point in time, take a recess, permit counsel to speak with Ms. Nash, and then once the part[ies have] had the opportunity to do that, which they need to do off the record, we will, ... go back on the record

and see where we stand at that point." (Italics added.)

[FN20] Given that Gagliardini had represented Nash for over three years through two hung juries and the third trial was already underway, it was only prudent for the trial court to investigate the possibility of resolving the issue in a manner that would not require Gagliardini to withdraw as defense counsel before granting such a motion.

Thus, the trial court did not foreclose the possibility that Gagliardini would withdraw as Nash's attorney. Rather, it gave Nash an opportunity, with the assistance of independent counsel, to decide, first, whether she wanted to waive her right to the attorney-client privilege and allow Gagliardini to testify and, second, if she decided she wanted Gagliardini to testify, whether she would be willing to consent to him continuing as her defense attorney under Rule 5–210(C). By stating it would "see where we stand" after Nash discussed the matter with Bryan, the trial court indicated that it would revisit Gagliardini's motion to withdraw if Nash were to decide that she wanted him to testify but she were unwilling to consent to his continued representation under Rule 5–210(C).

The court was in recess from 9:30 a.m. to 1:00 p.m. to allow time for Nash to discuss the matter with Bryan. When the proceedings resumed on the record, the trial court observed that Nash had an opportunity to speak with both Gagliardini and Bryan. Bryan informed the court that Nash "would, pursuant to those discussions, be willing to waive her right to not have her lawyer participate ... to the extent that ... she is agreeable that Mr. Gagliardini be allowed to negotiate a stipulation, which stipulation would be in place of live testimony...." Bryan explained that Nash was willing to waive the attorney-client privilege to that extent.

Gagliardini then reiterated that Nash's waiver was conditional upon the parties agreeing to a stipulation, emphasizing, "It's not a waiver for all purposes." In other words, Nash was willing to waive the attorney-client privilege for the purpose of negotiating a stipulation only. The court responded: "That's my understanding, also. And, obviously, if the stipulation is not arrived at, it certainly will take necessary time for Mr. Bryan to consult further with Ms. Nash regarding that." Again, the court's observation that "it certainly will take necessary time" suggested that it would be willing to revisit Gagliardini's motion to withdraw if the parties could not agree to a stipulation or otherwise resolve the matter. [FN21] The parties were able to agree to a stipulation, however, and this resolved the matter without Gagliardini testifying in the case.

[FN21] If no stipulation had been reached, there were still potential outcomes that would not have required Gagliardini to withdraw. Nash could have decided not to waive the attorney-client privilege to any further extent, in which case there would have been no issue of Gagliardini testifying at all. Or she could have waived the privilege, allowed Gagliardini to testify, and given her informed, written consent to his continued representation.

Perhaps, given the difficulty of countering the evidence, Gagliardini could have moved to exclude the recording of Nash's telephone conversation with her father, or the parties could have agreed to a stipulation informing the jury that Nash expressed to her father a desire for Patterson's statements not to be presented at trial without mentioning the Fifth Amendment or the right to cross-examine witnesses.

Essentially, Nash's position is that the trial court denied her the opportunity to have Gagliardini testify and not consent to his continued representation. But this is not what happened. Although the court stated that it was "denying the motion for [Gagliardini] to withdraw *at this point in time*," it gave Nash the opportunity to resolve the matter with the advice of counsel (both Gagliardini and independent counsel). We have no doubt that, if upon return from the initial recess, Nash had informed the court that she did want Gagliardini to testify but she would not consent to his continued representation, the court would have revisited the motion to withdraw.

Nash's arguments are premised on the assumption that the trial court's initial ruling on Gagliardini's motion to withdraw was final and not subject to reconsideration. For the reasons we have discussed, this assumption is incorrect, and, as a consequence, her arguments fail. For example, Nash argues she was forced to choose between (1) consenting to Gagliardini testifying and representing her or (2) losing Gagliardini's testimony. But the trial court did not foreclose the possibility that she could choose to waive the attorney-client privilege and allow Gagliardini to testify while not consenting to his continued representation.

Nash's remaining claims relating to the motion to withdraw are without merit. She argues the "consent" the trial court "extracted" from her violated Rule 5–210(C). This argument fails because ultimately Gagliardini did not testify and, therefore, informed, written consent under Rule 5–210(C) was not required. She asserts the stipulation was forced upon her, but there is no evidence in the record to suggest Nash did not voluntarily agree to the stipulation. She claims the trial court's actions interfered with her right to counsel. This argument is difficult to understand. She claims error in the denial of Gagliardini's motion to withdraw; yet, if the motion had been granted, Gagliardini would not have continued to represent her, and she would no longer have the benefit of his *independent evidentiary decisions*. Instead, because the motion to withdraw was provisionally denied, Nash was able to discuss the matter with both Gagliardini and independent counsel in deciding how to proceed. Nash asserts the trial court created a conflict akin to forcing joint representation on a codefendant, but the court in this case did not require Nash to keep an attorney with a conflict of interest.

In sum, we reject Nash's contention that the manner in which the trial court and the parties resolved Gagliardini's motion to withdraw resulted in reversible error.

Nash, 2015 WL 4880841, at *6–14.

    b.  Analysis

    Petitioner couches this claim as one of ineffective assistance of counsel; however, her

claim is actually based on an alleged conflict of interest whereby Petitioner was allegedly

deprived of counsel at a critical stage of the proceedings.  The claim is meritless.

    First, as Respondent correctly states, there is no Supreme Court precedent squarely

addressing the conflict of interest claim in the context of the facts of this case.  Harrington v.

Richter, 562 U.S. 86, 101 (2011).  The Supreme Court has only addressed a Sixth Amendment

denial of counsel due to conflict of interest in the context of multiple representations by counsel. See Mickens v. Taylor, 535 U.S. 162 (2002) (addressing potential conflict of interest where defense counsel represented the defendant in one case as well as the victim in that case in a separate case). "It is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (quoting 28 U.S.C. § 2254(d)(1)). Therefore, habeas relief is unavailable.

Second, the record shows no conflict of interest, and Petitioner was not denied counsel at any critical stage. Petitioner claims the trial court erred by denying counsel's motion to withdraw, but as discussed by the appellate court, the denial was provisional only. The trial court provided Petitioner with independent counsel to discuss the issue and allowed her to decide how she wished to proceed. The trial court stated the issue would be revisited if the parties could not come to an agreement. In addition, defense counsel did not testify. The parties instead agreed on a stipulation which resolved the matter without defense counsel testifying. Therefore, Petitioner was not denied counsel at any critical stage. Finally, Petitioner argues she was forced to accept defense counsel's continued representation in the event he testified. Not so. The trial court did not foreclose the possibility that Petitioner could choose to waive the attorney-client privilege to allow defense counsel to testify, while not consenting to his continued representation. For the foregoing reasons, the claim should be rejected.

### 2. Special Circumstance Finding

Petitioner next alleges that the special circumstance finding was not supported by evidence. As previously noted, the state court agreed with Petitioner's argument and vacated the finding. Therefore, this claim is moot.

## IV. RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: __**March 14, 2018**__              _____**/s/ Jennifer L. Thurston**
                                            UNITED STATES MAGISTRATE JUDGE